# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| AMI SHAFRIR BERG,<br><br>               Plaintiff,<br><br>     v.<br><br>SHAI BAR-LAVI and<br>SAUL BIENENFELD,<br><br>               Defendants. | C.A. No. 2025-0959-LWW |

## MEMORANDUM OPINION

Date Submitted: February 2, 2026
Date Decided: March 27, 2026

Charles D. Vavala & Matthew C. Conover, WILKS LAW, LLC, Wilmington, Delaware; *Counsel for Plaintiff Ami Shafrir Berg*

David A. Dorey, James G. Gorman III & Gregory P. Ranzini, BLANK ROME LLP, Wilmington, Delaware; Nicholas C. Guth, BLANK ROME LLP, Philadelphia, Pennsylvania; Layla S. Najjar & Nicholas R. Spiller, BLANK ROME LLP, Washington, D.C.; *Counsel for Defendants Shai Bar Lavi and Saul Bienenfeld*

**WILL, Vice Chancellor**

This post-trial decision resolves a proceeding under 8 *Del. C.* § 225 to determine the rightful control of Tracki, Inc. The plaintiff claims to be Tracki's sole stockholder and director, relying on a purported 2019 written consent to justify his recent attempt to oust the defendants. But trial revealed—through expert forensic evidence—that the written consent and an accompanying stock ledger were fabricated. The plaintiff is not a stockholder or director of Tracki, and he lacks standing to press this action. Judgment is therefore entered for the defendants.

Because this case was litigated in bad faith, I shift fees to the defendants. But I reduce their fee request by half to account for their own transgressions. The defendants admitted to backdating corporate documents and to submitting false testimony to this court.

Regrettably, this suit is a product of mutual deceit. Both parties treated fundamental requirements of Delaware corporations—not to mention the most basic expectations of this court—as mere suggestions. Their behavior transformed what should have been a straightforward governance dispute into a morass of forgery and perjury. Although the plaintiff's fictitious evidence dictates the legal outcome, the defendants' reciprocal misconduct ensures that neither side emerges from this litigation unblemished.

1

# I.   BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

## A.   Trackimo's Invention

Defendant Shai Bar Lavi and plaintiff Ami Shafrir Berg first met in the early 1990s at a convention in Las Vegas.[2]  That meeting marked the beginning of a long-standing business relationship and eventual friendship.[3]

By 2011, Bar Lavi was running a company creating cellular phones for international travel.[4]  When a client requested that he develop a tracking device for luggage, Bar Lavi was inspired.[5]  He created a personal tracking device that could track "anything that you love [that] you don't want to lose."[6]

---

[1] *See* Joint Submission of Pre-trial Order (Dkt. 63) ("PTO").  Trial occurred over two days, during which two fact witnesses and two expert witnesses testified live in person, and one fact witness testified live by Zoom.  *See* Trial Trs. Vols. I and II (Dkts. 88-89).  Trial testimony is cited as "[Name] Tr. __."  The trial record contains 597 joint exhibits and five deposition transcripts.  Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined.  *See* Joint Ex. List (Dkt. 63); Pl.'s Notice of Lodging (Dkt. 82).  Deposition transcripts are cited as "[Name] Dep. __."

[2] PTO § II ¶ 1; Berg Tr. 14.

[3] PTO § II ¶ 1; Berg Tr. 14, 69; Bar Lavi Tr. 334.

[4] Bar Lavi Tr. 332; Bar Lavi Dep. 61-62.

[5] Bar Lavi Tr. 332.

[6] *Id.*; Bar Lavi Dep. 62.

On November 6, 2013, Bar Lavi's Israeli counsel formed the Israeli corporation Vestigo Technologies Ltd. to launch the tracking devices.[7] Trackimo LLC, a United States subsidiary of Vestigo that would act as its marketing arm, was also formed.[8] Bar Lavi founded Vestigo alongside two business partners.[9] Defendant Saul Bienenfeld, a New York and Florida-licensed attorney, acted as U.S. legal counsel.[10]

The tracking devices were sold under the brand name Trackimo.[11] The fledgling company operated under a business-to-business model, relying on revenue from selling devices at cost with a one-year subscription.[12]

## B. Berg's Financial Support

In April 2016, Bar Lavi brought Berg on as an investor for Vestigo.[13] Berg advanced an initial $400,000 loan as part of a $1,000,000 commitment.[14] He

---

[7] PTO § II ¶ 2; Bar Lavi Tr. 332-33; Bienenfeld Tr. 210; JX 6 (Vestigo certificate of incorporation).

[8] Bar Lavi Tr. 332-33, 336, 348; Berg Tr. 53; Bienenfeld Tr. 208-10; JX 7 (Trackimo certificate of incorporation). Trackimo was originally a New York limited liability company and later converted into a Delaware limited liability company. Bar Lavi Tr. 332-33.

[9] Bar Lavi Tr. 332-33, 336; Berg Tr. 28; *see also* Bar Lavi Dep. 158.

[10] Bienenfeld Tr. 209-10, 212; PTO § II ¶ 17.

[11] Bar Lavi Tr. 332-33, 340, 358; *see also* PTO § II ¶ 4.

[12] Bar Lavi Tr. 337, 339, 341; Berg Tr. 53; *see also* PTO § II ¶ 4.

[13] Bar Lavi Tr. 334; Berg Tr. 15.

[14] Berg Tr. 14; Bar Lavi Tr. 334; JX 14.

obtained a minority equity interest in Vestigo.[15] On July 11, 2016, Bienenfeld helped

Berg incorporate Totoco, Inc., a Delaware corporation, that Berg could use to

provide more funding to Vestigo.[16]

Berg began to provide ideas on Vestigo's business model. Bar Lavi was keen

to leverage Berg's expertise in online sales directly to consumers.[17] To that end,

Berg assisted with Vestigo's marketing operations.[18] Totoco became an authorized

distributor of Trackimo-branded products.[19] It managed Trackimo's Amazon sales

channel, including online marketing and customer support functions.[20]

## C. The Vodafone Deal

In 2017, the European telecommunications company Vodafone became

interested in selling Trackimo devices.[21] To adapt to Vodafone's needs, Bar Lavi

---

[15] JX 14; *see also* Bar Lavi Tr. 334-35.

[16] PTO § II ¶ 3; JX 15 (Totoco certificate of incorporation); Bar Lavi Tr. 355-56, 387; Berg Tr. 19; Bienenfeld Tr. 206.

[17] Bar Lavi Tr. 336-37; Berg Tr. 13 (testifying that he "had a B2C [business-to-customer] business" in the 2000s and created and marketed multiple products).

[18] Berg Tr. 21; Bar Lavi Tr. 336-37.

[19] PTO § II ¶ 4.

[20] *Id*.

[21] Bar Lavi Tr. 338-39.

4

opted to use a business-to-customer model, which would focus on making money from data subscriptions rather than the device itself.[22]  It was a success.[23]

Bar Lavi replicated this model with Vestigo.[24]  Vestigo launched the tracking devices under a new brand name: "Tracki."[25]  The product was the same as Trackimo but would now be sold under the business-to-customer model, including on Amazon.[26]

### D.    Tracki, Inc.'s Formation

In February 2019, Bar Lavi sought to create a formal vehicle for the Tracki brand.[27]  He instructed Bienenfeld to work with Berg to incorporate a U.S. entity.[28]  By that point, Berg was a key driver of the devices' marketing on Amazon.[29]

---

[22] *Id.* at 339-40 (describing the model as having "the product being the razor and the subscriptions being the blades").

[23] *Id.* at 339.

[24] *Id.* at 340.

[25] *Id.* at 340-41.

[26] *Id.* at 341-42; PTO § II ¶ 5.

[27] Bar Lavi Tr. 342; *see* PTO § II ¶ 5.  He did not want to use the existing Trackimo entity since it operated a store on Amazon that had negative reviews.  Bar Lavi Tr. 342.

[28] Bienenfeld Tr. 218; Bar Lavi Tr. 344.

[29] Bar Lavi Tr. 343-44; Berg Tr. 21.  Berg also had purchased the domain name Tracki.com. PTO § II ¶ 7; Berg Tr. 23.  Bar Lavi claims that he did not tell Berg to do so. Bar Lavi Tr. 341.

On February 7, 2019, Berg held a call with Bienenfeld, and Tracki, Inc. was incorporated in Delaware the next day.[30] Tracki's certificate of incorporation authorized 200 shares of common stock.[31]

### E. The "Secret Pact"

According to Berg, he insisted on 100% equity ownership of Tracki upon its formation.[32] Berg claims that this ownership was kept hidden because of a "secret pact" he had previously made with Bar Lavi.[33]

This purported pact was described by Berg as follows. Bar Lavi dreamed of taking Vestigo public.[34] But Berg was a reputational risk, having been the victim of a financial crime decades earlier.[35] Bar Lavi was, in Berg's estimation, concerned about the press discussing the crime.[36] As a result, Berg asserts that Bar Lavi asked

---

[30] *See* JX 55 (Feb. 7, 2019 email from Berg to Bienenfeld with subject line "Please call me soon re Tracki inco[rp]"); Berg Tr. 29-30; PTO § II ¶ 8; JX 62 ("Tracki Certificate of Incorporation") 1. Berg and Bar Lavi also registered a trademark for Tracki around that time. PTO § II ¶ 6; Bar Lavi Tr. 344; Berg Tr. 42-43.

[31] Tracki Certificate of Incorporation; PTO § II ¶ 9; Berg Tr. 31.

[32] Berg Tr. 21-23, 30.

[33] *Id*. at 63-64.

[34] Bar Lavi Tr. 345, 383-84; Berg Tr. 18.

[35] Berg Tr. 16-21; *see also* Bar Lavi Tr. 345; JX 2 (news release describing how Berg was defrauded of "$40 million in cash, real property and businesses").

[36] Berg Tr. 18.

him to publicly represent that Tracki was a subsidiary of Vestigo, though Berg was the true owner of its shares.[37]

Berg contends that on February 8, he held a Skype call with Bar Lavi to obtain documentation supporting his ownership of Tracki.[38] He testified that Bar Lavi sent, by Skype chat, two documents executed on February 8, 2019: (1) a written consent of directors (the "2019 Written Consent") and (2) a stock ledger (the "2019 Stock Ledger"; together, the "2019 Documents").[39]

Tracki's certificate of incorporation did not name any directors.[40] But the 2019 Written Consent listed Bar Lavi as Tracki's sole director, and purported to issue all 200 shares of Tracki's authorized stock to Berg.[41] It also appointed Bar Lavi as President and Treasurer of Tracki, and Bienenfeld as Secretary.[42] The 2019 Stock Ledger reflected that Berg was the sole owner of Tracki's 200 shares.[43] Berg maintains that he received a WinZip file, which he saved to his laptop and then extracted to an SD card before locking the SD card in a safe.[44]

---

[37] *Id*. at 63-64.

[38] *Id*. at 39, 57, 88.

[39] *Id*. at 31-34, 38-39, 87-88; JX 63 ("2019 Written Consent"); JX 61 ("2019 Stock Ledger").

[40] *See generally* Tracki Certificate of Incorporation.

[41] 2019 Written Consent.

[42] *Id.*

[43] 2019 Stock Ledger.

[44] Berg Tr. 57-59, 122-23.

7

Bar Lavi's account of Tracki's formation is markedly different. He denies that the February 8 meeting with Berg occurred and that he transmitted the 2019 Documents to Berg.[45] Bar Lavi insists that Vestigo always owned Tracki. Bienenfeld also denies creating the 2019 Written Consent or the 2019 Stock Ledger.[46]

## F. Tracki's Corporate Informality

Operationally, Tracki ran smoothly. Berg worked to market Tracki's devices on Amazon, just as he had with Trackimo.[47] From a governance standpoint, however, Tracki's corporate record was a fiction. Bienenfeld—a criminal defense lawyer—served as the corporate secretary.[48] He routinely backdated corporate documents to suit his clients' requests.

On July 9, 2020, for example, a Vestigo executive asked Bienenfeld to "create . . . a document establishing the ownership of Tracki by Vestigo" for a 2019 audit.[49] Using a 2014 Trackimo written consent as a template, Bienenfeld prepared a written consent issuing 1,500 Tracki shares to Vestigo, with Bar Lavi listed as Tracki's sole

---

[45] Bar Lavi Tr. 347-48 (calling Berg's story "a huge lie"). Bar Lavi testified that he does not have a computer. *Id*.

[46] Bienenfeld Tr. 246-249. Bienenfeld further testified that he could not have created the documents on February 8 because he strictly observes Shabbos. *Id*. at 249-50.

[47] Berg Tr. 27-28, 49; *see also* Bar Lavi Tr. 356.

[48] Bienenfeld Tr. 204, 218, 224.

[49] JX 221 (email exchange between Bienenfeld and Bar Lavi).

director (the "2020 Written Consent").[50]  The issuance of 1,500 shares—beyond the 200 authorized for Tracki—was an error carried over from the Trackimo consent template.[51]  The 2020 Written Consent also listed Bar Lavi as Tracki's President and Treasurer, and Bienenfeld as Secretary.  It was backdated to February 9, 2019.[52]  On January 19, 2021, Berg was sent a copy of the 2020 Written Consent.[53]

Bienenfeld also did not draft bylaws upon Tracki's formation, but he created them retroactively upon request.[54]  In December 2021, for instance, Berg asked Bienenfeld for Tracki bylaws to fulfill a requirement of Amazon UK.[55]  Bienenfeld then created bylaws using a corporate form service.[56]  The resulting bylaws, which were backdated to March 8, 2019, described Tracki as having a three-person board

---

[50] *Compare* JX 222 (2014 Trackimo written consent), *with* JX 224 ("2020 Written Consent").  *See also* JX 223 (July 9, 2020 email exchange where Bienenfeld sends the 2020 Written Consent back to Vestigo); Bienenfeld Tr. 230-31, 275-79.

[51] Bienenfeld Tr. 227.  The 2020 Written Consent erroneously states that the shares issued were of Trackimo stock.  *See* 2020 Written Consent.

[52] 2020 Written Consent.

[53] JX 300.

[54] Bienenfeld Tr. 233-35, 239.  The parties stipulated that Bienenfeld generated Tracki's bylaws in March 2019, around the time of its formation.  PTO § II ¶ 10; *see* JX 360 (bylaws dated Mar. 8, 2019).  But at trial, Bienenfeld admitted that the referenced bylaws had been backdated.  Bienenfeld Tr. 234-35.

[55] Bienenfeld Tr. 235-37; JX 363 (Dec. 2, 2021 email between Bienenfeld and Berg with subject line "Re: Amazon UK wants Tracki corporate-bylaws"); *see also* JX 361 (Dec. 2, 2021 email where Berg requests bylaws).

[56] Bienenfeld Tr. 235.

of directors.[57]   Because Amazon frequently rejected Bienenfeld's bylaws, he periodically prepared additional sets.[58]

### G. The Consulting Agreement

On April 10, 2021, Tracki and Totoco executed a Consulting Agreement governed by Israeli law.[59]  It formalized Berg's role in assisting with the "sales and marketing" of Tracki.[60]  As consideration, Totoco would receive a $25,000 monthly consulting fee, a 5% sales bonus on Tracki's revenues, and a 2% sales bonus on Vestigo's revenues.[61]

The Consulting Agreement ran until October 1, 2024, after which either party could terminate it at will upon 90 days' prior written notice.[62]  Berg executed the document, which explicitly referred to Tracki as "a subsidiary of Vestigo."[63]

---

[57] JX 364 (bylaws dated Mar. 8, 2019) art. II, § 1; Bienenfeld Tr. 235-37.  Bienenfeld testified at trial that he meant to input February 8, 2019, the date of Tracki's incorporation. *Id.* at 235.

[58] Bienenfeld Tr. 237-38; *see* JX 377 (Dec. 28, 2021 email from Bienenfeld to Berg providing bylaws with a corporate seal).  Another set of bylaws drafted by Bienenfeld, purportedly dated January 2, 2020, list Bar Lavi as the sole director of Tracki. JX 369 art. II, § 1.

[59] JX 332 ("Consulting Agreement") § 8.

[60] *Id.* § 1.1.

[61] *Id.* at Ex. A §§ 4-5.

[62] *Id.* § 2.1-.2.

[63] *Id.* at 1.

Contemporaneously, Vestigo and Totoco entered into a convertible promissory note, under which Totoco could convert the capital it advanced to Vestigo into shares.[64]

## H.    The Ownership Dispute

For years, Berg acquiesced to Vestigo holding Tracki out as a wholly owned subsidiary.  Berg often received—and sometimes signed—financial and legal documents attesting to Vestigo's ownership of Tracki.[65]  His communications with Bar Lavi and vendors reflected that same understanding.[66]  In October 2023, he even clarified to third parties that he was not the owner of Tracki.[67]

---

[64] JX 331 (convertible promissory note).

[65] *See, e.g.*, JX 283 at 5-25 (2019 federal tax returns sent to Berg stating that Tracki is a subsidiary of Vestigo, and that Vestigo owns 100% of Tracki's shares); *id.* at 31 (auditors' report stating that Tracki "is a wholly owned subsidiary of Vestigo Technologies Ltd."); JX 294 (2020 Vestigo valuation report stating that Tracki is a "wholly owned subsidiary of Vestigo Technologies Ltd."); Berg. Tr. 149-50 (confirming Berg had the valuation report); JX 512 at 2-3 (Berg failing to list Tracki as his asset on an undated wealth report); JXs 263-65 (2020 Mizrahi Bank loan documents to Vestigo executed by Berg that represent Tracki as an asset of Vestigo); Berg Tr. 146-48 (confirming Berg's knowledge of the loan documents and stating that "whatever [Bar Lavi] asked [him] to sign, [he] signed").

[66] JX 376 (Dec. 2021 email exchange where Bienenfeld generated Tracki bylaws for Berg to provide to Amazon that list Bar Lavi as the sole stockholder); JX 384 (Jan. 2022 WhatsApp thread where Berg indicates that Vestigo owns 100% of the shares of Tracki); JX 513 (December 2023 WhatsApp exchange transmitting financial statements to Berg that state Vestigo "has 100% owned subsidiaries, [including] Tracki Inc[.]").

[67] In an October 1, 2023 director's declaration, Berg stated that he was the majority stockholder of Vestigo and the product owner of Tracki. JX 441 at 7-16.  After a Trackimo employee clarified to the private equity firm receiving the questionnaire that Berg was only a consultant, Berg was asked to amend his questionnaire. *See* JX 440.  He did so. JX 441 at 1.

11

By 2024, 90% of Vestigo's revenues were generated through the sale of Tracki-branded products.[68] Tracki was a success. But Berg and Bar Lavi's relationship broke down.

According to Berg, Bar Lavi was caught embezzling by Vestigo.[69] Berg confronted Bar Lavi about the purported theft, after which Bar Lavi stopped communicating with him.[70]

In April 2024, Berg exercised his option under the promissory note to convert his loan into Vestigo shares.[71] He then attempted a failed takeover of Vestigo's board to "stop [Bar Lavi] from damaging the company" through misappropriation.[72] He hired counsel and sent an email to "Vestigo Officers" detailing his purported status as the controlling stockholder due to the conversion, and his intention to effect governance changes.[73]

On May 29, 2024, Berg unilaterally held a Vestigo board meeting.[74] Acting as chairman, Berg altered the signatory rights of Vestigo and its subsidiaries—

---

[68] Bar Lavi Tr. 356-57; Berg Tr. 170-71; *see also* JX 515 (June 2024 filing in Israeli court where Berg states Tracki is "responsible for approximately 90% of the *Subsidiaries*' revenues" (emphasis added)) ("Statement of Claim").

[69] Berg Tr. 74.

[70] *Id*. at 74-75.

[71] *Id*. at 129-30; Bar Lavi Tr. 335.

[72] Berg Tr. 161-62; Bar Lavi Tr. 364-65.

[73] Berg Tr. 162; JX 453 (May 27, 2024 email to "Vestigo Officers").

[74] Bar Lavi Tr. 163.

designating Tracki and Trackimo as such—before appointing himself as the sole Tracki director.[75]

Berg and Bar Lavi's dispute then escalated to litigation. In June 2024, Berg filed suit against Bar Lavi and Vestigo, among others, in the District Court of Tel Aviv.[76] He sought to determine the rightful ownership of Vestigo, claiming that he held "at least 74.45%" of Vestigo's shares.[77] He simultaneously filed an application for a temporary restraining order, seeking to prevent the disposition of Vestigo's shares.[78] In these filings, Berg repeatedly referred to Tracki as a subsidiary of Vestigo.[79] Berg withdrew his claims after the defendants agreed to begin settlement discussions.[80]

---

[75] JX 456 (May 29, 2024 Vestigo board minutes); *see also* Berg Tr. 163-65.

[76] PTO § II ¶¶ 14-15; Statement of Claim; JX 480 (June 14, 2024 Israeli court affidavit filed by Berg) ("Tel Aviv Court Aff.").

[77] Statement of Claim 2; Tel Aviv Court Aff. ¶ 1. The issue of who owned Tracki was not before the Israeli court. Berg Tr. 67.

[78] JX 516 ("TRO Application") 2.

[79] Statement of Claim ¶ 3 ("Vestigo . . . holds the entire share capital of subsidiaries incorporated in the U.S.: Trackimo, Inc. and Tracki, Inc."); Tel Aviv Court Aff. ¶ 3 (also noting that Vestigo "holds . . . the entire share capital of . . . Tracki Inc."); TRO Application ¶ 4 (same). Berg claims that these were misstatements made because he was "emotionally distraught" from Bar Lavi's betrayal of their friendship and business relationship. Berg Tr. 66.

[80] Berg Tr. 67-68.

On August 29, 2024, Vestigo gave notice of termination of the Consulting Agreement, which was stayed due to the ongoing settlement discussions.[81]

Negotiations broke down once more. On June 5, 2025, Vestigo renewed its termination notice of the Consulting Agreement.[82] The termination was to occur on September 3, 2025, when Berg would lose access to Tracki's systems and assets.[83]

## I.     The 2025 Written Consents

On August 20, 2025, Berg generated two written consents. The first consent purported to remove Bar Lavi and Bienenfeld from the Tracki board of directors and elect Berg as the sole director.[84] The second consent (together, the "2025 Written Consents") reduced Tracki's board from three directors to one, terminated Bar Lavi and Bienenfeld as officers, and appointed Berg as President, Treasurer, and Secretary of Tracki.[85]

The 2025 Written Consents relied on Berg's claimed status as the sole stockholder of Tracki—which he drew from the 2019 Written Consent and the 2019 Stock Ledger.[86] Although Berg had supposedly misplaced the 2019 Documents after

---

[81] JX 459 (notice of termination); Berg Tr. 137-38.

[82] Berg Tr. 80; JX 477 (renewed notice of termination).

[83] JX 477 ¶ 12.

[84] JX 481 (2025 stockholder consent).

[85] JX 482.

[86] Berg Tr. 79-82.

his Skype call with Bar Lavi in 2019, he claims to have found the SD card containing them in an empty suitcase that past April.[87] This was the first time he had invoked the 2019 Documents to direct Tracki's governance.[88]

On August 21, 2025, Vestigo filed suit in Israel against Berg and Totoco, seeking an injunction compelling Berg to return Tracki digital assets.[89] Two days later, the District Court of Tel Aviv provisionally enjoined Berg from presenting himself to any third party as Tracki's owner.[90] On September 26, pursuant to a temporary mandatory order, Berg was instructed to return Tracki's digital assets.[91] The Tel Aviv litigation is ongoing.[92]

### J.       This Litigation

On August 25, 2025, Berg filed this action under 8 *Del. C.* § 225, seeking a declaration that Bar Lavi and Bienenfeld were lawfully removed from Tracki's board and that Berg is its sole lawful director.[93] I expedited the case and entered a status quo order to govern Tracki's operations during the pendency of this suit.[94]

---

[87] *Id*. at 59-60, 123-24.

[88] *Id*. at 95-98.

[89] PTO § II ¶ 15; JXs 488-89 (Aug. 20, 2025 court filings).

[90] JX 498 at 3.

[91] JX 530 (2025 Tel Aviv District Court ruling) ¶ 18.

[92] PTO § II ¶ 14.

[93] *See* Verified Compl. for Declaratory J. (Dkt. 1) ("Compl.").

[94] *See* Dkt. 31.

The defendants filed their pre-trial brief on December 5, and Berg filed his pre-trial brief on December 8.[95] A two-day trial was held from December 16 to 17.[96] The defendants filed a post-trial brief on January 30, 2026, and Berg filed a post-trial brief on February 2, after which I took the matter under advisement.[97]

## II. ANALYSIS

Section 225(a) of the Delaware General Corporation Law (DGCL) provides that "[u]pon application of any stockholder or director . . . the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation."[98] The plaintiff bears the burden of proving his entitlement to relief by a preponderance of the evidence.[99] Actions under Section 225 are summary and "in the nature of an *in rem* proceeding."[100]

---

[95] *See* Pl.'s Pre-trial Br. (Dkt. 64); Defs.' Pre-trial Br. (Dkt. 62).

[96] *See* Dkt. 84.

[97] *See* Pl.'s Post-trial Br. (Dkt. 95); Defs.' Post-trial Br. (Dkt. 94). I concluded that post-trial oral argument was unnecessary.

[98] 8 *Del. C.* § 225(a).

[99] *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008).

[100] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *4 (Del. Ch. Sep. 17, 1997).

Because the proceeding is narrow in scope, the court may only grant the relief needed to resolve the dispute over corporate office.[101] It will decline to address matters collateral to deciding the identity of the entity's lawful directors or officers.[102]

Berg seeks a declaration that he had the power to remove Bar Lavi and Bienenfeld as directors of Tracki. To adjudicate whether Berg's removal of the defendants was valid, I must first determine who lawfully owns Tracki's voting stock. Section 227(a) of the DGCL grants the court ancillary jurisdiction in a Section 225 matter to "determine the right and power of persons claiming to own stock to vote at any meeting of the stockholders."[103] Berg has asserted his purported right to exercise that voting power,[104] and seeks a declaration that he has removal authority as Tracki's sole stockholder. Resolving that ownership dispute is a prerequisite to determining whether Berg is entitled to relief.[105]

---

[101] *See Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011) ("A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer.").

[102] *See Avgiris Brothers, LLC v. Bouikidis*, 2022 WL 4672075, at *13–14 (Del. Ch. Sep. 30, 2022) (declining to resolve collateral matters in the Section 18-110 context).

[103] 8 *Del. C.* § 227(a); *see also CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 390 (Del. 2023) (affirming the Court of Chancery's invalidation of a board's instruction to disregard certain votes in a Section 225 proceeding).

[104] *See supra* note 93 and accompanying text.

[105] *See Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *23 (Del. Ch. Nov. 30, 2017) (noting that Section 225 implicitly grants the court power to adjudicate beneficial ownership if necessary to determine the rightful directors, and that a judgment

17

Berg has not met his burden. As detailed below, the 2019 Documents he relies upon are fabrications and based on an implausible "secret pact." His years of conduct after Tracki's formation further undermine his claim to ownership. Because Berg failed to prove he is Tracki's sole stockholder, he lacked the authority to issue the 2025 Written Consents and lacks standing to pursue this action. His remaining collateral requests are therefore rejected.

## A.     The 2019 Documents

Berg relies on the validity of the 2019 Documents to remove Bar Lavi and Bienenfeld as Tracki directors. He argues that the "resolution of this action may be determined solely by reference to the [2019 Documents]."[106] The defendants respond that the 2019 Documents are fabricated and cannot serve as valid authority for Berg's stock ownership, and consequently, his subsequent removal of them.[107]

### 1.     The Fabricated Documents

Under Delaware law, only the "holders of a majority of the shares then entitled to vote at an election" can remove directors.[108] The court "may look to the [stock]

---

failing to resolve such a dispute would be meaningless). My determination of stock ownership and voting power is made solely for purposes of resolving the director control dispute under Section 225.

[106] Pl.'s Post-trial Br. 23; *see also* Pl.'s Pre-trial Br. 5 n.3.

[107] Defs.' Post-trial Br. 1, 15; *see also* Defs.' Pre-trial Br. 44-47.

[108] 8 *Del. C.* § 141(k); *see also Simple Glob., Inc. v. Banasik*, 2021 WL 2587894, at *10 (Del. Ch. June 24, 2021). The two exceptions to this rule—involving a staggered board and cumulative voting—are inapplicable here. *See* 8 *Del. C.* § 141(k).

ledger to determine the stockholders entitled to vote or act by written consent."[109] "The purpose of the stock ledger is to enable the corporation to determine who is eligible to exercise the important rights of a stockholder."[110]

Tracki's certificate of incorporation authorized 200 shares at the time of formation.[111] It has never been amended.[112] The only stock ledger in the record is the 2019 Stock Ledger, which was created pursuant to the 2019 Written Consent that issued all 200 shares to Berg.[113] Because there is no "competing contemporaneous issuance document or stock ledger," Berg argues that "[t]he record resolves this case decisively."[114] Not so. At trial, there was credible evidence that the 2019 Documents are inauthentic.

### a. The Secret Pact

The 2019 Documents rest on an implausible story—"a secret pact" between Berg and Bar Lavi from Tracki's formation to present.[115] Berg claims that he

---

[109] *Boris v. Schaheen*, 2013 WL 6331287, at *13 (Del. Ch. Dec. 2, 2013); *see* 8 *Del. C.* § 219(c) ("The stock ledger shall be the only evidence as to who are the stockholders entitled by this section . . . to vote in person or by proxy at any meeting of stockholders.").

[110] *Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.,* 535 A.2d 1357, 1359 (Del. 1987).

[111] *See generally* Tracki's Certification of Incorporation.

[112] PTO § II ¶ 9.

[113] *See* 2019 Written Consent; 2019 Stock Ledger.

[114] Pl.'s Post-trial Br. 23.

[115] *See supra* Section I.E.

19

received the documents on February 8, 2019 from Bar Lavi through Skype.[116] Because—according to Berg—Bar Lavi felt that Berg's past dealings made him a reputational risk, Berg kept the documents on SD card—even misplacing it for years—before it resurfaced in an empty suitcase just ahead of this litigation.[117]

Berg's testimony is shifting and unsupported. The supposed manner of receiving the documents from Bar Lavi—whether that be from "dragg[ing] and dropp[ing]" the documents to an SD card, or extracting a compressed WinZip file— is inconsistent.[118] The 2019 Written Consent was also purportedly executed by Bar Lavi in his capacity as the sole director of Tracki.[119] But Berg "ha[d] no idea" who drafted the documents or how Bar Lavi's signature appeared "out of the blue."[120] Both Bar Lavi and Bienenfeld credibly testified that they did not create the documents and that the Skype chat and call never occurred.[121]

---

[116] *See supra* notes 38-39 and accompanying text.

[117] *See supra* notes 34-37, 86-88 and accompanying text. Berg's story is outlandish. He states that he misplaced the SD card containing the documents when he moved from the Philippines to Bangkok in October 2023. Berg Tr. 59-60, 123-24. He then found them by happenstance when he was about to trash an old suitcase. *Id.* at 123-24. He never used the documents for any purpose until August 20, 2025, when he sought to remove the defendants from their positions at Tracki. *Id.* at 124.

[118] Berg Tr. 58, 103, 105, 112-14.

[119] 2019 Written Consent.

[120] Berg Tr. 87-88.

[121] *See supra* notes 45-46 and accompanying text.

Berg's narrative requires me to accept that, to maintain this secret pact, he willingly misrepresented his ownership of Tracki to numerous third parties for years.[122]  I find this unlikely.

### b.  Forensic Evidence

The defendants rely on forensic expert testimony that the 2019 Documents are manufactured.  Before weighing the substance of this evidence, I first address a procedural dispute about its admissibility.  I then examine its substance, which confirms that the 2019 Written Consent was created using the later-drafted 2020 Written Consent as a template.

### i.  *Admissibility*

At trial, Berg asked that I exclude as untimely the December 10, 2025 supplemental disclosure of defense expert Shaun Vodde, as well as any related testimony.[123]  The supplemental disclosure, Berg contends, belatedly offers new opinions about text-level and content-based alterations in the 2019 Written Consent.[124]

---

[122] For example, Berg executed bank loan documents for Vestigo that represent Tracki as an asset of Vestigo, rather than Berg.  *See* JXs 263-65.  Lying on a bank application is a crime.  *See, e.g*, 18 U.S.C. § 1014.

[123] Trial Tr. 4-5.  Specifically, Berg objected to the introduction of JXs 563-76, JXs 579-89, and Vodde's related testimony regarding those exhibits.  Vodde Tr. 412.

[124] Pl.'s Post-trial Br. 29.

In deciding whether to accept an expert's supplemental disclosure, I must balance (1) the original scheduling order, (2) whether there is good cause to allow the supplement, (3) the prejudice to the opposing party, and (4) any trial delay.[125]

The operative scheduling order lacked an expert discovery deadline.[126] But as Berg correctly points out, the absence of that deadline is not unusual in a summary proceeding. Nor is it a blank check for a party to submit a supplemental disclosure whenever it likes. Here, Vodde's supplemental disclosure was served less than a week before trial.

Although this timing was not ideal, the defendants had good cause for their belated disclosure. It was offered in response to new considerations raised by Berg shortly before trial. Berg's December 5 pre-trial brief argued that the 2019 Written Consent was copied from a 2014 Trackimo template, and his December 9 interrogatory responses introduced a newly recollected narrative about a WinZip file to explain away metadata anomalies.[127] The defendants reasonably concluded that

---

[125] *Coleman v. PricewaterhouseCoopers, LLC*, 902 A.2d 1102, 1106 n.6 (Del. 2006).

[126] *See* Scheduling Order (Dkt. 41).

[127] *See* JX 586 (citing Berg's pre-trial brief, received on December 5, and his responses to interrogatories and his Rule 26 expert disclosure, received on December 9, as raising new issues warranting re-examination).

these eleventh-hour shifts warranted Vodde revisiting his original opinion to directly address Berg's explanations.[128]

Prejudice to Berg is minimized by the fact that his counsel had the opportunity to question Vodde about the supplemental disclosure during Vodde's December 11 deposition.[129] Berg also had the assistance of his own expert, Michael Nelson, who was retained to rebut Vodde.[130] Berg amplified any prejudice by waiting six days—until the morning of trial—to object to the supplemental disclosure.[131] Trial was not delayed.

Excluding the supplemental disclosure would eliminate evidence going to the core of this litigation, which turns on the validity and veracity of the 2019 Written Consent and its accompanying 2019 Stock Ledger.[132] Berg himself contends that these documents are case-dispositive.[133] Given the existence of good cause, minimal

---

[128] *See Moses v. Drake*, 109 A.3d 562, 566 (Del. 2015) ("Good cause is likely to be found when . . . the need for more time was neither foreseeable nor [the movant's] fault.").

[129] *See* Vodde Dep. 80. *Contra Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 270 F. Supp. 2d 519, 524 (D. Del. 2003) (declining to admit supplemental disclosures because doing so would essentially "reopen discovery").

[130] JX 586 at 2 (defendants' notice of supplemental disclosure) ("We obviously expect that you will discuss this with Mr. Nelson. Mr. Nelson is welcome to sit in on Mr. Vodde's deposition tomorrow.").

[131] Trial Tr. 4-5.

[132] *Cf. Green v. Alfred A.I. duPont Inst. of Nemours Found.*, 759 A.2d 1060, 1063 (Del. 2000) ("When the excluded evidence goes to 'the very heart' of plaintiffs' case and 'might well have affected the outcome' of the trial, the exclusion of the evidence warrants a new trial . . . ." (citation omitted)).

[133] Pl.'s Post-trial Br. 23.

prejudice, and lack of a delay in trial proceedings, I admit Vodde's supplemental disclosure and related testimony.[134]

## ii.    *Substance*

Vodde is a Senior Vice President of Forensic Technology & Consulting at TransPerfect Legal.[135]   He credibly testified that the 2019 Written Consent has several font- and color-based alterations that suggest the documents are inauthentic.

Vodde opined that the 2019 Written Consent was based on a template.  He observed that portions of the 2019 Written Consent appeared "darker in color from others, a little bit more bold."[136]  The text color mismatch includes the entirety of paragraph five, which issues 200 shares to Berg, the address in paragraph seven, which lists Tracki's principal place of business as Berg's P.O. box, and the number "8" in the date of the written consent—February 8, 2019.[137]  This is evident to the naked eye.

---

[134] Berg also attempts to exclude Vodde's testimony based on its substance, including the use of allegedly unreliable methodologies.  Pl.'s Post-trial Br. 34-44. These arguments were raised for the first-time in post-trial briefing.  They are therefore waived. *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 593 (Del. Ch. 2010) ("Plaintiffs assert that Defendants waived any *Daubert* challenge to Grabowski's testimony by failing to raise this challenge during either the pretrial proceedings or the trial itself. . . . I find merit in Plaintiffs' objection."), *aff'd sub nom.*, *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[135] Vodde Tr. 406-07.

[136] *Id.* at 413; *see* JX 63.

[137] Vodde Tr. 413-14; *see* JX 63; *see also* Berg Tr. 36 (listing his P.O. Box as the Las Vegas address in the 2019 Written Consent).

Vodde explained that, after running a pre-flight report in Adobe Acrobat Pro,[138] it became evident that the bolder words and letters were written using "CID Type 2 font."[139] He identified this font as common to support large character sets like those in Asian languages.[140] Berg resides in Thailand.[141]

Most compellingly, Vodde ran a side-by-side comparison with the 2020 Written Consent that demonstrated that it was the template from which the 2019 Written Consent was created. When the two documents are compared, the 2020 Written Consent is identical to the 2019 Written Consent in all respects *except* for the words written using Type 2 CID font.[142]

This forensic match confirms that the 2020 Written Consent, which was first created on July 9, 2020, and then provided to Berg in 2021,[143] served as the template for the 2019 Written Consent. The 2019 Written Consent is identical to the 2020

---

[138] JX 588 (pre-flight report); *see* Vodde Tr. 415-16. A pre-flight report uses a proofreading application built into Adobe Acrobat Pro that can identify font types. *Id.*

[139] Vodde Tr. 418-19; JX 588 at 1 ("Uses CID Type 2 Font (16 matches on 2 pages)"). Berg's rebuttal expert, Nelson, stated that he had "no reason to doubt the results of that Preflight report." Nelson Tr. 471. Nelson was not asked to run a similar report. *Id.*

[140] Vodde Tr. 417-18. Nelson agreed with this determination. Nelson Tr. 472.

[141] PTO § II ¶ 16.

[142] Vodde Tr. 418-20, 423-24; *see also* JX 588 (native file demonstrating the same). *Compare* JX 300 (2020 Written Consent), *with* JX 588 (2019 Written Consent in native, pre-flight format) (replacing "stock certificate" with "uncertified shares," "Cedarhurst, New York" with "Las Vegas, Nevada" and so on).

[143]*See supra* notes 49-53 and accompanying text.

Written Consent except for the portions granting power to Berg. Thus, the 2019 Written Consent cannot be a contemporaneous document created when Tracki was formed.[144]

Berg argues that the metadata—the file creation and modification dates—prove the 2019 Written Consent was created on February 8, 2019.[145] But as Vodde demonstrated at trial, such date and time settings are easily alterable by saving them to an SD card.[146] That theoretical possibility, coupled with the blatant flaws in Berg's story, makes the metadata unavailing. The overwhelming weight of the evidence suggests that the 2019 Written Consent was created for Berg's takeover attempt and this litigation.

### 2. Corporate Process

Even if I were to disregard the forensic evidence, the 2019 Documents fail to establish Berg's ownership of Tracki due to fundamental defects.

---

[144] Vodde also testified that the file-level metadata of the 2019 Written Consent demonstrates that it was likely created on a PC computer. JX 571 (metadata); Vodde Tr. 428. Nelson agreed with this assessment. Nelson Tr. 478-79. Bar Lavi does not own a computer, and Bienenfeld uses a Mac. But Berg uses a PC. Bar Lavi Tr. 348; Bienenfeld Tr. 244; Berg Tr. 103.

[145] Nelson Tr. 463.

[146] JX 582 (video demonstration of altering a file's metadata). Nelson testified that though altering metadata manipulation is possible in theory, it is not easy to do in practice. Nelson Tr. 467. But that does not make it impossible. It is possible that Berg, a self-professed technology expert, could have done so. Berg Tr. 85-86.

8 *Del. C.* § 108 requires that, after a certificate of incorporation is filed, the incorporator hold an organization meeting to elect directors, unless the initial directors were named in the certificate.[147] Tracki's certificate of incorporation did not name initial directors.[148] Nor did the incorporator meet or act by written consent to do so.[149]

The 2019 Written Consent that Berg relies on purports to issue all 200 shares of Tracki to Berg and lists Bar Lavi as Tracki's sole director.[150] But that is legally impossible; no Tracki directors were ever elected. Tracki's failure to follow Section 108, which is a required corporate formality, renders the 2019 Written Consent and its accompanying stock issuance invalid.[151]

### 3. Berg's Pattern of Conduct

Berg's conduct after Tracki's formation provides more reason to reject his ownership claim.

---

[147] 8 *Del. C.* § 108(a).

[148] Tracki Certificate of Incorporation.

[149] Berg Tr. 95.

[150] 2019 Written Consent.

[151] Under Delaware law, stock issued without proper corporate authorization is a "defective corporate act." 8 *Del. C.* § 204(h)(1); *see In re CertiSign Hldg., Inc.*, 2015 WL 5136226, at *4 (Del. Ch. Aug. 31, 2015) ("The Company's outstanding stock is defective because it was issued days before the Amended Certificate authorizing those shares was filed with the Delaware Secretary of State."). Although the DGCL provides mechanisms to validate defective acts (8 *Del. C.* §§ 204, 205), no such ratification or judicial validation has occurred regarding this purported issuance.

"If the corporation does not have a stock ledger, or if the stock ledger is non-existent, then the Court may consider extrinsic evidence to determine stock ownership."[152] Such extrinsic evidence may include the parties' actions or patterns of conduct, testimony, communications between the parties, meeting minutes, and other documents.[153] Tracki lacks a genuine stock ledger because the only version in the record—the 2019 Stock Ledger—is fabricated.[154] Thus, I look to Berg's post-formation conduct as extrinsic evidence.

That evidence is fatal to Berg's ownership claim. Since the time of Tracki's incorporation, Berg never objected to—and affirmatively corroborated—Vestigo's ownership of Tracki. His confirmations of Vestigo's ownership were made in financial materials, legal documents, the Consulting Agreement, and purported Tracki board minutes that resulted from Berg's attempted takeover of Vestigo.[155] At the request of a Vestigo executive, Berg even clarified that he was *not* the owner of

---

[152] *Boris*, 2013 WL 6331287, at *13; *Rainbow Navigation*, 535 A.2d at 1359 (same).

[153] *See, e.g.*, *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *3 (Del. Ch. Jan. 30, 2015) (looking to testimony, corporate records, and tax filings to determine stock ownership), *aff'd sub nom.*, *In re Numoda Corp.*, 128 A.3d 991 (Del. 2015); *Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531, 539 (Del. Ch. 1999) (considering "the defendants' pattern of conduct after the stock was issued" in resolving whether parties intended "to authorize the issuance"), *aff'd*, 748 A.2d 913 (Del. 2000).

[154] *Boris*, 2013 WL 6331287, at *14 ("It is a well-established principle of current Delaware law that '[s]tock issued without authority of law is void and a nullity . . . .'" (citation omitted)).

[155] *See supra* notes 63, 65-66, 74-75 and accompanying text.

28

Tracki.[156] His own filings in the Israeli litigation as recently as late 2024 corroborate the same.[157] Not until this litigation did Berg claim to own Tracki.

Berg's countervailing narrative is riddled with holes. He points to his involvement in Tracki's formation and operations—including a founding call with Bienenfeld,[158] creating the domain name and app interface, filing the trademark, and managing bank accounts.[159] Yet none of these acts overcome Berg's pattern of holding out Vestigo as Tracki's owner. Berg's personal labor and financial contributions are consistent with his role as Tracki's "marketing arm."[160] He is not "entitled" to own Tracki simply by virtue of his sweat equity, however meaningful his efforts may have been.[161]

Berg attempts to salvage his claim by highlighting the defendants' own dubious governance practices. He argues that their "sustained course of misconduct"

---

[156] *See supra* note 67 and accompanying text.

[157] *See supra* note 79 and accompanying text. Again, Berg being "distraught" cannot excuse these misstatements. Berg Tr. 66.

[158] *See supra* Section I.D.

[159] PTO § II ¶¶ 6-7; Berg Tr. 47-48, 50; JX 92 (email to Berg requesting the latter update the bank account details of Tracki at various vendors).

[160] Bar Lavi Tr. 343.

[161] Berg Tr. 100 ("What entitled me to own Tracki is that I was the only one with skin in the game.").

29

compels the rejection of Vestigo's ownership of Tracki, and he asks that I draw an adverse inference against the defendants that he is Tracki's sole stockholder.[162]

The defendants' conduct is indeed troubling. "The DGCL contemplates, in large part, a formal approach to corporate governance."[163] The defendants fell short of that standard. Bienenfeld admitted at trial to routinely backdating documents, including the 2020 Written Consent that was used to retroactively establish Vestigo's ownership in 2019.[164] He also backdated multiple sets of bylaws, even leading the parties to erroneously stipulate that a set of bylaws was created in March 2019.[165]

Yet the defendants' corporate sloppiness and outright deceit do not win the day for Berg. This is a Section 225 action—a summary proceeding limited to resolving the control of Tracki. I am solely adjudicating the validity of the 2025 Written Consents, and—as a prerequisite to that determination—Berg's stock ownership. Berg has the burden to prove his control of Tracki; he cannot meet it.[166]

---

[162] Pl.'s Post-trial Br. 44-46. I note that Berg raised this argument for the first time in the post-trial briefing.

[163] *Boris*, 2013 WL 6331287, at *13.

[164] *See supra* Section I.F.

[165] *See supra* Section I.F; Bienenfeld Tr. 234-35; *see also* PTO § II ¶ 10.

[166] *See Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 453 (Del. 2012).

The defendants' misconduct and lack of good corporate hygiene do not make Berg Tracki's owner.

*　　　　*　　　　*

Berg has failed to prove that he owns or controls Tracki. Consequently, he lacked authority to issue the 2025 Written Consents, rendering them invalid and of no legal effect. Although the lack of a post-incorporation director election prevents me from identifying Tracki's lawful board, I can definitively conclude that Berg is not its sole director.

Because Berg is neither a valid stockholder nor a director of Tracki, he lacks standing to maintain this Section 225 suit.[167] The additional relief he seeks fails for that reason and because it is collateral to determining the lawful board of Tracki.[168]

## B. Attorneys' Fees

Both parties seek fee-shifting. The defendants center their request on Berg's creation of fake corporate documents to initiate this suit.[169] Berg, for his part, cites

---

[167] *See Noe v. Kropf*, 2008 WL 4603577, at *3 (Del. Ch. Oct. 15, 2008) (indicating that standing only exists for stockholders, directors, or officers whose title to office is contested in a 225 action).

[168] *Simple Glob.*, 2021 WL 2587894, at *10 ("Generally, the court's authority in a Section 225 proceeding is narrow, and it should not inject issues purely collateral to the determination of a disputed election.").

[169] Defs.' Post-trial Br. 50-54; *see also* Defs.' Pre-trial Br. 49-53.

discovery abuses and dishonesty from Bar Lavi and Bienenfeld.[170]  I consider each side's position in turn.

"Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[171]  Delaware courts "recognize[] bad faith litigation conduct as a valid exception to that rule."[172]  This exception is not "lightly" invoked.[173]  The moving party must demonstrate "by clear evidence" that the opposing party acted with subjective bad faith.[174]  "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[175]

Berg's conduct in prosecuting this litigation constitutes a clear case of bad faith.  His ownership claim rests on two fabricated documents—the 2019 Written

---

[170] Pl.'s Post-trial Br. 57-63.

[171] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[172] *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1222 (Del. 2012).

[173] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 880 (Del. Ch. 2012) (citation omitted), *aff'd*, 59 A.3d 1206 (Del. 2012).

[174] *Shawe v. Elting*, 157 A.3d 142, 150 (Del. 2017).

[175] *Arbitrium*, 720 A.2d at 545-46.

Consent and 2019 Stock Ledger.[176]  By offering the 2019 Documents as genuine, Berg sought to perpetrate a fraud on this court.

Berg compounded this duplicity by insisting that I entertain a "secret pact" designed to hide his ownership.  The very premise of this pact—that his status as a crime victim years ago necessitated shielding his involvement from the public in the event of a hypothetical public offering—defies common sense.  Even if Berg's name carried negative implications for Tracki, it strains credulity to imagine that he would paper himself out of his own company without keeping a single confidential document protecting his stake.  Such a pact would have involved years of misrepresentations, some of which might amount to criminal conduct.[177]  Not only is there no credible evidence corroborating this implausible arrangement, but Berg's own representations to the Israeli court contradict it.[178]

Berg points the finger at the defendants' own litigation misconduct, including frequent theory shifts and the obstruction of an orderly discovery process.[179]  He cites Court of Chancery Rule 37 as an "independent basis" for shifting fees.[180]  That

---

[176] *See Reagan v. Randell*, 2002 WL 1402233, at *5 (Del. Ch. June 21, 2002) (shifting fees where a litigant "forged [a] document for the purpose of usurping power from a majority shareholder and, in furtherance of that scheme, perpetrated a fraud on this Court by relying on that forgery in litigation before the Court").

[177] *See supra* note 122 and accompanying text.

[178] *See supra* note 79 and accompanying text.

[179] Pl.'s Post-trial Br. 61.

[180] *Id.*

rule is not the appropriate vehicle for fee-shifting here.[181] The "[a]buse of the discovery process" can, however, provide a "basis to shift fees" under the bad faith exception to the American Rule.[182]

Most of Berg's complaints indicate that the defendants followed an aggressive, though not bad faith, litigation strategy.[183] But not all. At trial, Bienenfeld—an attorney barred in New York and Florida—admitted to submitting sworn affidavits to the court that made false statements about Tracki's governance.[184] Under Delaware law, "[a] person is guilty of perjury in the third degree when the person swears falsely."[185] This is, of course, not a criminal court. Still, the fact "that a party engaged in conduct which, on its face, would establish a *prima facie* case for violating a criminal statute provides powerful evidence that the party acted in bad faith."[186] And as an attorney, Bienenfeld is obligated to "exercise the highest

---

[181] Rule 37 invokes a presumption of fee-shifting when a party fails to honor a discovery request that is at odds with the high bar to shift fees under the bad faith exception to the American Rule. *See Beck v. Atl. Coast PLC*, 868 A.2d 840, 851-52 (Del. Ch. 2005). When Rule 37 has been invoked post-trial, the parties have reserved that right in pre-trial proceedings. *See Foley v. Session Corp.*, 345 A.3d 537, 561-62 (Del. Ch. 2025). No such reservation occurred here.

[182] *Bay Cap. Fin., L.L.C. v. Barnes & Noble Educ., Inc.*, 2020 WL 1527784, at *11 (Del. Ch. Mar. 30, 2020), *aff'd*, 249 A.3d 800 (Del. 2021).

[183] Pl.'s Post-trial Br. 59-60.

[184] Bienenfeld Tr. 262-72; *see* JX 501 (Bienenfeld affidavit).

[185] 11 *Del. C.* § 1221.

[186] *Choupak v. Rivkin*, 2015 WL 1589610, at *21 (Del. Ch. Apr. 6, 2015), *aff'd*, 129 A.3d 232 (Del. 2015).

standard of ethical conduct" so as not to "reflect adversely on the legal profession as a whole and . . . undermine public confidence."[187]

Because Berg bore the burden to prove his case, Bienenfeld's false statements did not affect the outcome of this action. In fact, I have declined to accept most of Bienenfeld's testimony. That does not excuse the defendants' own deceit. Bienenfeld's sworn mistruths are inimical to the integrity of this court. To account for the defendants' contributions to the misconduct in this suit, I will shift only 50% of the attorneys' fees and costs reasonably incurred by the defendants.[188]

## III. CONCLUSION

Judgment is entered for the defendants. The 2025 Written Consents are invalid and without effect. Berg lacks standing to pursue this Section 225 action because he is not a stockholder or director of Tracki. I decline, however, to grant the defendants' request for a declaration preserving the status quo *ante.* Because Tracki never followed the statutory requirements to validly elect an initial board of

---

[187] This is true under Delaware law as well as New York law, where Bienenfeld is admitted. *Matter of Rowe*, 80 N.Y.2d 336, 340 (1992).

[188] *See Arbitrium*, 720 A.2d at 547 ("The Court of Chancery has broad discretion in fixing the amount of attorney[s'] fees to be awarded.").

directors, there is no lawful board to recognize. My holding is therefore limited to the finding that Berg does not own or control Tracki.

The defendants are awarded 50% of their reasonable attorneys' fees and costs incurred in this litigation. They must submit a Rule 88 affidavit, to which Berg will have ten business days to respond.

The parties must thereafter confer on and submit a proposed form of final order. Because this final post-trial decision resolves the merits of the action, the interim status quo order is hereby dissolved. Berg's pending motion to enforce that order is denied as moot.[189]

---

[189] Dkt. 98.